UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  9:19-cv-81108-ROSENBERG/REINHART

MARIA ESPINOZA,

    Plaintiff,

v.

TARGET CORPORATION and
JANE GREER,

    Defendants.

_____/

**ORDER GRANTING DEFENDANT TARGET
CORPORATION'S AMENDED MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant Target Corporation's Amended Motion for Summary Judgment.  DE 46.  The Court has carefully considered the Motion, Plaintiff's Response thereto [DE 56], Defendant's Reply [DE 58], and the record, and is otherwise fully advised in the premises.  For the reasons set forth below, Defendant Target Corporation's Amended Motion for Summary Judgment is **GRANTED**.

### I. UNDISPUTED FACTS

Plaintiff Maria Espinoza went shopping at a Target store in Boynton Beach, Florida ("the store") on April 10, 2017.  DE 45 and 55, ¶ 1.  She slipped on a puddle of liquid while walking through an aisle in the stationary department, fell to the ground, and began bleeding from the head onto the floor.  *Id.* ¶¶ 1, 3, 5, 7.  She maintains that the liquid was milk, and Target employees generally believed that the liquid was milk.  *See id.* ¶¶ 2, 9.

An employee working in the pharmacy named Roshel went to the stationary department after a customer notified her that someone had fallen.  *Id.* ¶¶ 4, 5.  She saw Espinoza lying on the

floor in the puddle, which she estimated was "about two feet, three feet, maybe" in size. *Id.* ¶ 5; DE 45-2 at 4. Roshel would later testify that "there were no footprints" or cart "track marks" in the puddle when she arrived at the scene and that there "was a lot of blood." DE 45 and 55, ¶ 5; DE 45-2 at 4. She "didn't see anything that would resemble that someone else had walked in [the puddle] or been there." DE 45-2 at 5.

Customers began to arrive at the scene. DE 45 and 55, ¶ 6. Roshel went to alert Pam, another employee, of Espinoza's fall and then resumed her work duties. *Id.* Pam arrived and saw Espinoza on the floor with "people hovering over her" and trying to help her and "a lot" of blood on the floor. *Id.* ¶¶ 7, 22; DE 45-3 at 4. Pam would later testify that she did not remember seeing any footprints or cart tracks in the puddle and that the puddle covered "a pretty big area." DE 45 and 55, ¶¶ 7, 8; DE 45-3 at 4-5.

At least two other employees, Diasmine and Debbie, also arrived at the scene. DE 45 and 55, ¶ 8. Diasmine saw Espinoza on the floor, "quite a bit of blood on the floor," and "a pretty decent size spill." *Id.* ¶ 21; DE 45-7 at 6-7. Diasmine would later testify that she did not recall seeing any footprints or cart tracks in the puddle. DE 45 and 55, ¶ 21; DE 45-7 at 7. Debbie saw Espinoza on the floor and someone helping her. DE 45 and 55, ¶ 15; DE 45-6 at 5. Debbie would later testify that the spill was "pretty big" and that she did not see any "track marks [or] footprints" in the puddle and did not remember seeing any cart marks. DE 45 and 55, ¶ 15; DE 45-6 at 5-6.

Fire Rescue professionals arrived and took Espinoza out of the store on a stretcher. DE 45 and 55, ¶¶ 10, 12, 22, 26. Diasmine took photographs of the scene after Fire Rescue left. *Id.* ¶ 23; DE 45-6 at 18; DE 45-7 at 9-10. Some of the photographs depict a white-colored puddle of liquid

2

on the floor and bloody towels left by employees who had begun to clean the area. DE 45-3 at 4-5; DE 45-6 at 17-18; DE 45-7 at 9-10; *see* DE 45-9; DE 55-7.

Espinoza would later testify that she did not see liquid on the floor before she fell, did not see anyone spill liquid on the floor, and did not see anyone in the area where she fell immediately before her fall. DE 45 and 55, ¶ 11; DE 45-4 at 11. She did not know how the liquid came to be on the floor or how long the liquid was on the floor before she fell. DE 45 and 55, ¶ 11; DE 45-4 at 11. After she fell, her clothes were "all wet." DE 45 and 55, ¶ 11; DE 45-4 at 12.

The Target employees did not know how the milk came to be on the floor. DE 45 and 55, ¶¶ 8, 9, 28. They did not find any container. *Id.* ¶¶ 9, 16.

Upon hire, and on a yearly basis thereafter, Target employees undergo training in Target's policies and procedures on how to keep a store clean and how to ensure that nothing is on the floor. *Id.* ¶¶ 19, 28. Employees are trained that, as they walk through the store, they are to keep an eye out for anything on the floor and are to pick up anything that they see rather than pass by it. *Id.* ¶¶ 19, 28, 29. Employees are further trained that, if they see a liquid substance on the floor, they are not to leave the area and are to page another employee to bring supplies to clean up the substance. *Id.* ¶¶ 19, 28, 29. There are "spill stations" throughout the store that contain items such as paper towels, goggles, bags, a sweeper, and a dustpan. *Id.* ¶ 19.

Target does not know who last walked through the aisle in which Espinoza fell before her fall or when the aisle was last inspected before the fall. *Id.* ¶¶ 28, 29. Employees are assigned to specific areas of the store, and one employee would have been assigned to monitor the stationary department. *Id.* ¶ 28.

Debbie would later testify that she walked through the stationary department to look for a product for a customer approximately 30 to 45 minutes before Espinoza fell and that she did not see any liquid substance on the floor at that time. *Id.* ¶ 20; DE 45-6 at 4, 12. She did not know whether any employee inspected the department after she walked through it, but there was a "person in charge of that area" at the time and it was that person's job to go up and down the aisles and inspect the department. DE 45-6 at 12. Glue was the only liquid substance that was stocked in the stationary department. *Id.* at 5. Debbie had no recollection of any large, white spills in the stationary department before Espinoza's fall, had no recollection of anyone falling in the stationary department before Espinoza's fall, and had no recollection of anyone other than Espinoza falling in milk. DE 45 and 55, ¶ 17; DE 45-6 at 5.

## II.   PROCEDURAL BACKGROUND

Espinoza filed this negligence action against Target and Jane Greer, the alleged general manager of the store, in state court in April 2019. DE 1-2. Target removed the case to this Court, and the Court denied Espinoza's subsequent Motion to Remand. *See* DE 1; DE 5; DE 18.

The parties later stipulated to the dismissal of the claim against Greer without prejudice. DE 20. The Court construed the parties' stipulation as a Joint Motion to Dismiss the claim against Greer without prejudice and granted that Motion. DE 21. Target now moves for summary judgment on the remaining negligence claim. DE 46.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing

4

law, and 'genuine' if a reasonable trier of fact court return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A court ruling on a summary judgment motion views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). The court does not weigh conflicting evidence or make credibility determinations. *Id.* Upon discovery of a genuine dispute of material fact, the court must deny summary judgment and proceed to trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

If the movant shows that there is no genuine dispute as to a material fact, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). The non-moving party does not satisfy this burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Jones*, 683 F.3d at 1292 (quotation marks omitted). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones*, 683 F.3d at 1292 (quotation marks omitted). A mere scintilla of evidence supporting the non-moving party's position will not suffice. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

A non-conclusory affidavit based on personal knowledge, even if uncorroborated and self-serving, can create a genuine dispute of material fact that defeats summary judgment. *United States v. Stein*, 881 F.3d 853, 857-59 (11th Cir. 2018). But a conclusory affidavit will not defeat

5

summary judgment. *Id.* at 857. The word "conclusory" may be defined as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *Conclusory*, Black's Law Dictionary (11th ed. 2019). Conclusory allegations without specific supporting facts have no probative value. *Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013). Affidavits based upon information and belief, rather than personal knowledge, are also insufficient to withstand a motion for summary judgment. *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005).

An inference is reasonable if it is one that a reasonable and fair-minded person in the exercise of impartial judgment might draw from the evidence. *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). An "inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* at 1324 (quotation marks omitted); *see also Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (stating that inferences based upon speculation are not reasonable). But an "inference is not unreasonable simply because it is based in part on conjecture, for an inference by definition is at least partially conjectural." *Daniels*, 692 F.2d at 1326.

### IV.   ANALYSIS

Under Florida law,

> If a person slips and falls on a transitory foreign substance in a business establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Constructive knowledge may be proven by circumstantial evidence showing that:
>
> (a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or

6

(b) The condition occurred with regularity and was therefore foreseeable.

Fla. Stat. § 768.0755(1). Espinoza acknowledges that there is no evidence to support a conclusion that Target had actual knowledge of the milk puddle on the floor. DE 56 at 2. And she does not contend that evidence shows that this condition occurred with such regularity that it was foreseeable. *See generally* DE 56. Consequently, the issue in this case becomes whether there is evidence that the puddle existed for such a length of time that, in the exercise of ordinary care, Target should have known of it, and thus can be charged with having constructive knowledge.

Fla. Stat. § 768.0755(1) places the burden to prove constructive knowledge on a plaintiff. *Oliver v. Winn-Dixie Stores, Inc.*, 291 So. 3d 126, 128 (Fla. 4th Dist. Ct. App. 2020). The plaintiff does not need to prove constructive knowledge at the summary judgment stage, but, if the defendant shows that there are no disputed factual issues about its constructive knowledge, the burden shifts to the plaintiff to come forward with counter-evidence sufficient to reveal a genuine issue. *Id.* at 129. The mere presence of a liquid on the floor is insufficient to establish constructive knowledge. *Delgado v. Laundromax, Inc.*, 65 So. 3d 1087, 1090 (Fla. 3d Dist. Ct. App. 2011). The record must contain additional facts to create a permissible inference about the length of time that the liquid was on the floor. *Palavicini v. Wal-Mart Stores E., LP*, 787 F. App'x 1007, 1013 (11th Cir. 2019).

Target argues that it is entitled to summary judgment because there is no evidence to indicate how long the puddle was on the floor before Espinoza fell, such that there is no genuine issue of material fact as to whether the puddle existed for such a length of time that Target should have known of it. A plethora of caselaw may be cited for the proposition that, where there is no evidence to suggest the length of time that a liquid substance was on the floor before an accident,

7

there is no genuine issue as to constructive knowledge, and summary judgment for the defendant is appropriate. *See, e.g.*, *id.* at 1012-13 (affirming a grant of summary judgment after concluding that, "Simply put, Palavicini cannot identify when the liquid presented itself"); *Pussinen v. Target Corp.*, 731 F. App'x 936, 938-39 (11th Cir. 2018); *Oliver*, 291 So. 3d at 129-30 (affirming a grant of summary judgment where "[n]o facts suggest the grape and surrounding liquid were on the ground for enough time to impute constructive knowledge to Winn-Dixie"); *Lago v. Costco Wholesale Corp.*, 233 So. 3d 1248, 1251-52 (Fla. 3d Dist. Ct. App. 2017); *Encarnacion v. Lifemark Hosps. of Fla.*, 211 So. 3d 275, 278 (Fla. 3d Dist. Ct. App. 2017) (affirming a grant of summary judgment where "the answers to interrogatories and depositions do not establish how long the substance had been on the floor"); *Delgado*, 65 So. 3d at 1090; *Miller v. Big C Trading, Inc.*, 641 So. 2d 911, 912 (Fla. 3d Dist. Ct. App. 1994) (affirming a grant of summary judgment after concluding that, "since there is no indication as to how long the grape was there, there can be nothing but speculation to support the claim that the employees could, let alone should, have seen it in time to remove it"); *see also Winn-Dixie Stores, Inc. v. Marcottee*, 553 So. 2d 213, 215 (Fla. 5th Dist. Ct. App. 1989) (reversing a jury verdict for a plaintiff where there was "no evidence as to the length of time the dangerous condition existed prior to the injury").

Espinoza contends that Target's inspection policy, footprints in the milk, the size of the milk puddle, and the temperature of the milk support a conclusion that the puddle existed for a sufficient length of time to charge Target with constructive knowledge. The Court has considered each of her contentions and concludes that none of these factors, either alone or conjunction with any other factors, create a genuine issue of material fact for trial.

8

First, Espinoza maintains that Target had "no policy for inspecting or monitoring its aisles for dangerous conditions." DE 56 at 5. The assertion that Target had "no" such policy is a mischaracterization of the evidence. Espinoza does not dispute that Target does have policies and procedures on how to keep a store clean and how to ensure that nothing is on the floor, and she does not dispute that Target regularly trains its employees in those policies and procedures. *See* DE 45 and 55 ¶¶ 19, 28. Employees are to keep an eye out for things on the floor as they walk through the store and to pick things up rather than pass by them. *Id.* ¶¶ 19, 28, 29. Specific to liquid substances, an employee who sees liquid on the floor is to remain in the area, page another employee to bring supplies, and clean up the liquid. *Id.* ¶¶ 19, 28, 29. Target assigns employees to monitor specific areas of the store. *Id.* ¶ 28. Espinoza points to no evidence to indicate that these procedures were not followed on the day that she fell.

The evidence does show that Target does not schedule inspections or require inspections to be conducted at particular intervals. *See* DE 45-10 at 7. And Espinoza argues that it is possible that no Target employee walked down the aisle in which she fell for as long as 45 minutes prior to her fall.[1] Without speculating, the most that can be concluded from this evidence is that the milk spill occurred anywhere from a few seconds to 45 minutes before Espinoza fell. The fact that "there was no inspection for a given length of time in itself provides no proof that the defect was actually there for a sufficient period to place a landowner on reasonable notice of its existence." *Wal-Mart Stores, Inc. v. King*, 592 So. 2d 705, 707 (Fla. 5th Dist. Ct. 1991).

---

[1] More precisely, Espinoza's argument is that "no employee had been in aisle G10 for 30-45 minutes prior" to her fall. DE 56 at 6. This too is a mischaracterization of the evidence. What can be gleaned from the evidence is that the *last known* employee to walk through the area, Debbie, did so approximately 30 to 45 minutes before Espinoza fell. *See* DE 45 and 55, ¶ 20. It is undisputed that Target does not know who last walked through the aisle, but there would have been one employee assigned to the stationary department whose job was to inspect the department. Id. ¶¶ 28, 29; DE 45-6 at 12.

In *Pussinen v. Target Corp.*, the evidence as to the timing of a liquid spill consisted of an employee's testimony that he last walked through the area where the plaintiff fell at least fifteen minutes before the fall. *See* 731 F. App'x at 938-39. The plaintiff did not contend that this employee was the only employee working in the store or even the only employee working in the area of the spill at the time of the fall. *Id.* at 938. In reviewing the district court's grant of summary judgment, the Eleventh Circuit Court of Appeals stated:

> Thus, that [the employee] didn't walk by the area of the fall in the 15 minutes before the incident doesn't mean that another employee didn't. It therefore would be pure speculation for a jury to conclude, based solely on [the employee's] testimony, that no Target employee had inspected the area for more than 15 minutes, or that the liquid was on the floor for more than fifteen minutes before Pussinen's fall.

*Id.* at 938-39. The court affirmed the grant of summary judgment. *Id.* at 939.

Similarly, it is unknown whether Debbie was the last employee to walk through the stationary department before Espinoza fell, and it is unknown when the department was last inspected before she fell. The milk spill may have occurred anywhere from a few seconds to 45 minutes before she fell. This evidence does not itself demonstrate that the puddle existed for such a length of time that Target should have been aware of it. *See id.* at 938-39; *King*, 592 So. 2d at 707. The Court therefore must consider Espinoza's remaining contentions to determine whether there is any indication of the length of time that the milk puddle existed before she fell.

Espinoza argues that footprints can be seen in the milk in the photographs taken of the scene and that these footprints support an inference that people had walked through the milk puddle before she fell, such that the puddle must have existed for some length of time. Employees did testify that the photographs depict at least one footprint in the milk. *See* DE 45-6 at 17-18; DE 45-7 at 10, 14; *see also* DE 45-9; DE 55-7. Evidence of footprints or track marks in a liquid may tend

10

to show that the liquid was on the floor for a duration of time sufficient to impute constructive knowledge. *Palavicini*, 787 F. App'x at 1012; *see also Berbridge v. Sam's E., Inc.*, 728 F. App'x 929, 930 (11th Cir. 2018) ("Circumstantial evidence of the passage of time may include dirt, scuffing, or tracks in a substance." (quotation marks omitted)).

The photographs were taken after Espinoza slipped and fell in the milk puddle, after several employees responded to the area, after customers arrived at the scene and were "hovering over" her, after Fire Rescue professionals responded and took her out of the store on a stretcher, and after employees had begun to clean the area with towels. *See* DE 45-3 at 4-5; DE 45-6 at 18; DE 45-7 at 9-10. When asked whether she recalled if the Fire Rescue professionals were "walking around in this area," Diasmine responded, "I mean, everybody was everywhere almost. Especially them because they were getting closer to [Espinoza] to get her up." DE 45-7 at 10. And in fact, some of the photographs depict people's feet in the area. *See* DE 45-9 at 2, 5. Espinoza points to no evidence to indicate that the footprint or footprints in the photographs were not left by the many individuals to arrive at the scene after she fell. She points to no evidence to indicate that anyone saw footprints at any time prior to the photographs being taken. Roshel, the first known employee to arrive at the scene after the fall, testified that "there were no footprints" in the milk puddle when she arrived. DE 45-2 at 4-5. An inference that there were footprints in the milk puddle before Espinoza fell would be not only purely speculative and conjectural, but also contrary to this testimony. Such an inference is not reasonable. *See Daniels*, 692 F.2d at 1324. The footprint or footprints that the photographs depict in the milk puddle do not create a genuine dispute of material fact for trial.

11

Espinoza also argues that the size of the milk puddle demonstrates constructive knowledge. Employees testified that the puddle was "pretty big" and "a pretty decent size," and Espinoza avers in an affidavit that the puddle was "very large." *See* DE 45-3 at 4; DE 45-6 at 5; DE 45-7 at 7; DE 55-3 ¶ 4. Beyond these vague approximations as to the puddle's size, the only more precise estimation of size that the parties identify is Roshel's testimony that the puddle was "about two feet, three feet, maybe." DE 45-2 at 4.

In any event, Espinoza does not explain how the puddle's "large" size supports a conclusion that the puddle existed for any length of time. This is not a case where there is evidence that a puddle of liquid accumulated over a period of time, and thus the caselaw that Espinoza cites to support her argument about the puddle's size is inapposite. *See Erickson v. Carnival Cruise Lines, Inc.*, 649 So. 2d 942, 942-43 (Fla. 3d Dist. Ct. App. 1995) (reversing a grant of summary judgment where a puddle of water "approximately three to five feet in diameter" had accumulated from "a water leak from the ceiling which had trickled down the wall and onto the floor"); *Grayson v. Carnival Cruise Lines, Inc.*, 576 So. 2d 417, 417 (Fla. 3d Dist. Ct. App. 1991) (reversing a grant of summary judgment where there was evidence that "a puddle one to two inches deep and approximately six feet by twelve feet in diameter" had accumulated from water splashing over the sides of a pool); *see also Berbridge*, 728 F. App'x at 932 (affirming a grant of summary judgment but noting, "We also don't know the size of the substance. Had the puddle on the floor been large, that could have suggested, in light of the slow dripping observed by Berbridge, that the AC unit had been leaking for a while."). And Espinoza does not present any evidence to indicate that the spilled milk took some length of time to spread to the size of the puddle in which she fell. *Cf. Ordonez v. Target Corp.*, No. 13-14425-CIV, 2015 WL 11251986, *2 n.2 (S.D. Fla. Jan. 20,

12

2015) (granting summary judgment after a plaintiff slipped and fell in a soapy substance in a detergent aisle, despite the plaintiff's argument that, "since the substance had already spread to form a two foot puddle, the substance must have been on the floor for a significant length of time," because she did not "provide any factual support or expert opinion to substantiate" that argument and "[a]t best, she reache[d] her conclusory statement through speculation"). The milk puddle's size does not create a genuine dispute of material fact for trial.

Finally, Espinoza maintains that the temperature of the milk at the time that she fell supports a conclusion that the puddle existed for a sufficient length of time to charge Target with constructive knowledge. This argument is based on an affidavit that she signed after her deposition. *See* DE 55-3. She testified at deposition that she did not see liquid on the floor before she fell, did not see anyone spill liquid on the floor, did not know how the liquid came to be on the floor, and did not know how long the liquid was on the floor before she fell. DE 45-4 at 11. At the time of the deposition, she was not sure that the liquid was milk. *Id.* at 12.

In her affidavit, Espinoza relies on several inferences to reach a conclusion that "the milk was on the floor for a long enough period of time that the milk went from cold to warm." DE 55-3 ¶ 10. First, her conclusion is based on an inference that is not explicit in the affidavit—that the milk originated from a product sold in the store. She provides no evidence to support such an inference. Having no idea how the milk came to be on the floor, she has no personal knowledge to support this inference. *See* DE 45-4 at 11. It is undisputed that no container was found following her fall. DE 45 and 55, ¶¶ 9, 16. This inference is conjecture and speculation.

Espinoza avers that it "is evident from the photographs that the puddle of milk that I slipped and fell on is very large," and, based on the puddle's size, she maintains that "it is clear that the

13

puddle of milk that I slipped and fell on came from a 1-gallon container of milk." DE 55-3 ¶¶ 4, 6. She points to no specific facts to support her inference that the milk that formed the puddle originated from a gallon-sized container of milk. She does not define the vague term "large" that she uses to describe the size of the puddle, and she does not provide any specific facts from which a jury could determine the volume of milk that was spilled.

Espinoza next states that, from her experience shopping at the store, she "know[s] that all 1-gallon containers of milk are only found in the refrigerated section" of the store and, therefore, she "know[s] that the 1-gallon of spilled milk that [she] slipped and fell on came from the refrigerated section." DE 55-3 ¶ 7. Thus, from her unsupported inference that the milk that formed the puddle originated from a gallon-sized container, she rules out as the source of the puddle any unrefrigerated milk products that the store may sell in smaller-sized containers.

Then, based on her statement that the store only stocks gallon-sized containers of milk in the refrigerated section, Espinoza infers that the "temperature of the 1-gallon container of milk at the time it was spilled on aisle G10 was cold." *Id.* ¶ 8. Even if it were accepted that the milk came from a gallon-sized container that was kept in the refrigerated section at some point, she points to no specific facts to support her inference that the milk necessarily was cold at the time that it was spilled on the floor. She has no personal knowledge to support this inference, as she was not present when the milk was spilled and does not claim to have felt the milk when it was cold. *See* DE 45-4 at 11. This inference is also conjecture and speculation.

Finally, Espinoza states, "After I slipped and fell on the milk, I felt the temperature of the milk. The milk was warm." DE 55-3 ¶ 9. From this and her preceding statements, she reaches her conclusion that "the milk was on the floor for a long enough period of time that the milk went

14

from cold to warm." *Id.* ¶ 10.  She does not define the vague term "warm."  It is unknown whether, by using the term "warm," she means that the milk was at room-temperature, was heated, or, more generally, was any temperature above a refrigeration temperature.  *Cf. Berbridge*, 728 F. App'x at 932 (explaining, where a plaintiff had described the liquid substance on which she slipped as "dark" and "dirty," that she "did not provide any additional detail about what she meant by these terms" and that a reasonable jury could not infer constructive knowledge "from her vague comments that the substance was 'dark' and 'dirty'").  Moreover, Espinoza points to no evidence that would provide a jury any guidance as to the duration of time that it would take for milk to go from "cold" to "warm."  Even if it were accepted that the milk was of refrigeration temperature when it was spilled on the floor, a jury could only speculate as to the duration of time that the puddle existed before she fell.

The ultimate conclusion that Espinoza reaches in the affidavit—that the milk must have been on the floor for a sufficient length of time to charge Target with constructive knowledge—is based on inferences that are purely conjectural and speculative rather than grounded in personal knowledge or other evidence and on conclusory assertions unsupported by specific facts.  Such an affidavit does not defeat summary judgment.  *See, e.g.*, *Stein*, 881 F.3d at 857-59; *Myers*, 713 F.3d at 1327; *Ellis*, 432 F.3d at 1327; *Daniels*, 692 F.2d at 1324-26.  In sum, Espinoza's affidavit does not create a genuine dispute of material fact for trial.[2]

This case presents a situation where there is no evidence to support a reasonable inference as to the length of time that the milk puddle was on the floor before Espinoza fell.  In such a

---

[2] In reaching this conclusion, the Court relies not on the prohibition under Florida law against inference stacking, but on the applicable federal law cited here and in Section III above.  *See Berbridge*, 728 F. App'x at 932 ("Because a federal standard governs our assessment of whether an inference is allowable, we do not apply state-law rules against 'pyramiding' or 'stacking' inferences.").

15

situation, there is no genuine issue of material fact for a trial on constructive knowledge. Summary judgment for Target must be granted.

## V.   CONCLUSION

For the foregoing reasons, Defendant Target Corporation's Amended Motion for Summary Judgment [DE 46] is **GRANTED**. Final Judgment will issue by separate Order.

The Clerk of the Court is instructed to **CLOSE THIS CASE**. All pending motions are **DENIED AS MOOT**, all hearings are **CANCELLED,** and all deadlines are **TERMINATED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 29th day of May, 2020.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record